IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 25, 2020 Session

## STATE OF TENNESSEE v. CARL R. GREENE

**Appeal from the Criminal Court for Hamblen County**
**No. 18CR363    John F. Dugger, Jr., Judge**

_____

### No. E2019-01877-CCA-R3-CD

_____

The Defendant, Carl R. Greene, was convicted upon his guilty plea of theft of property valued at $60,000 or more but less than $250,000, a Class B felony. *See* T.C.A. §§ 39-14-103(a) (2018); 39-14-105(a)(5) (2018) (subsequently amended) (grading of theft). The trial court sentenced the Defendant, a Range I offender, to split confinement consisting of one year in jail followed by eight years on community corrections. The court ordered the Defendant to pay restitution of $83,457.60. On appeal, the Defendant contends that the court erred by imposing a nine-year, split confinement sentence and by failing to consider the Defendant's ability to pay the restitution amount. We reverse the judgment of the trial court and remand for resentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Brennan M. Wingerter (on appeal), District Public Defender's Conference; Gregory Eichelman (at guilty plea hearing and sentencing), District Public Defender; and Willie Santana (at guilty plea hearing and sentencing), Assistant District Public Defender, for the Appellant, Carl R. Greene.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Dan E. Armstrong, District Attorney General; David Gratz and Dustin Click, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

According to the State's recitation of the facts at the guilty plea hearing:

On October 7, 2015 [sic][1] . . . [the Defendant] established an account at Home Trust Bank, Morristown, Tennessee. The account was named "Kyle Judge Greene Estate, Carl R. Greene, Administrator. From the initial deposits deposited into the account there was $101,394.02. On January 4, 2016, the account was closed by a final cash withdrawal of $569.40.

. . . .

Between October 7, 2014, and January 4th, 2016, [the Defendant] spent $34,836.42 on estate matters leaving a deficit of $66,957.60 spent on non-estate matters. [The Defendant] also collected rent money in the amount of $16,000 that belonged to the estate. The total loss to the Kyle Judge Greene Estate was $83,457.60.

After the trial court inquired at the guilty plea hearing as to more details regarding the relationship between the Defendant and Kyle Judge Greene,[2] District Attorney General Investigator Bob Ellis testified that he had investigated the matter after it "was first brought to the attorney general's office through chancery court." He said he obtained bank records and determined that the bank account had been funded by four deposits of insurance checks. He said the account had been opened after the decedent's death. He said the decedent had made a will and that the Defendant was not the executor. Mr. Ellis thought the decedent's daughter, Terri Greene, was appointed executrix in the will. Mr. Ellis was unsure if the will had been probated. Mr. Ellis said no court file had ever been located and that the matter "came to our attention when [the Defendant] was having to answer to chancery court . . . for his actions."

When asked how the Defendant was able to establish the bank account without having been appointed executor, Mr. Ellis testified, "He just assumed that authority." Mr. Ellis said he "[didn't] recall finding" any documents which represented the Defendant as the executor of the decedent's estate. Mr. Ellis said the Defendant had told him that the Defendant had received "[v]erbal authority from the decedent before the decedent's death." Mr. Ellis said, "There was a lawyer involved," who had been paid over $3,000 by checks written on the estate's bank account. Mr. Ellis said the decedent had owned a rental property and that the Defendant collected the rent but did not deposit it into the estate's bank account. Mr. Ellis said that the money in the estate's account was depleted through cash withdrawals, purchases, and checks written to the Defendant and the Defendant's sons. Mr. Ellis agreed that the Defendant wrote checks for $57,252.66,

---

[1] The record otherwise showed that the bank account was opened on October 7, 2014.

[2] Because Kyle Judge Greene and the Defendant share the same last name, we will refer to Kyle Judge Greene as "the decedent" for clarity.

of which $23,000 was for the Defendant's personal use, and that the Defendant withdrew $36,873.70 in cash. Mr. Ellis said he did not know how the Defendant had used the cash withdrawals.

After Mr. Ellis's testimony, the trial court announced that it had "unanswered questions" and wanted to conduct sentencing at a later date. The court stated that it wanted to know the Defendant's source of authority for opening the bank account and whether an accounting for the expenditures existed. When questioned by the court about how the funds had been spent, defense counsel stated that the Defendant had used "a large portion [on] estate matters" and some of the money for personal expenses. The court said, "I want to know where it went." The court insisted that the defense provide documentation of the expenses, rather than merely stating that the Defendant spent money for personal expenses. The court said, "Instead of just saying . . . it went for his personal use, . . . I want an accounting of where this money went. . . . You can say personal use but I want some documentation." Defense counsel advised the court that the defense contended the restitution amount was around $66,000, rather than the higher figure claimed by the State. Defense counsel stated that it had an affidavit regarding the Defendant's finances, that the Defendant had no assets, and that the Defendant lived in a rented trailer. Defense counsel stated that the defense was prepared to proceed with sentencing but that "if the Court wants more proof from the state, we certainly don't object to resetting it." Defense counsel also advised the court that he would "sit down with [the Defendant] and see if he can recollect. Most of this stuff was in the form of checks to himself that he used in cash."

The trial court found the Defendant guilty and set the sentencing hearing for a later date. The court stated that it wanted more information from the parties "about authority, . . . what happened with probate, . . . what happened with the money."

At the sentencing hearing, defense counsel advised the trial court that the Defendant had requested that day for counsel to ask the court to set aside the guilty plea. Counsel stated that the Defendant "firmly believes that the decedent gave him permission to take control over all of his property" when the decedent was on his deathbed and that the Defendant did not believe he was guilty of the offense. Counsel stated that the Defendant believed, "The beneficiary of the will . . . was not involved in [the decedent's] life." Counsel stated that the Defendant "probated the will, he filed a publication notice[.]" The court denied the Defendant's motion to set aside his guilty plea.

The presentence report was received as an exhibit. It reflected that the then-seventy-six-year-old Defendant was retired, had a history of steady employment from 1976 until 2009, had monthly Social Security income of $720, and received a monthly $140 food stamps benefit. His monthly expenses for rent, utilities, and medicine totaled $590. He reported that "his children help him a lot financially" and that he lived in a

trailer owned by his son.  He did not own a car.  He reported poor physical health and fair mental health.  He had no prior criminal history, aside from a few traffic offenses.  The Strong-R report, which was attached to the presentence report, concluded that the Defendant was at low risk to reoffend.  It noted that the Defendant minimized his criminality but that he generally respected the property of others.  The Strong-R report noted that the Defendant had family support and had relied on family members or others for management of his finances within the previous six months.

Documentation regarding the Defendant's health was received as an exhibit.  The documents reflected that the Defendant had a history of coronary artery disease, carotid artery disease, myocardial infarction, hypertension, hyperlipidemia, obstructive sleep apnea, significant obesity, diabetes mellitus, dyslipidemia, and tobacco abuse disorder.

A Petition for Probate of Will was received as an exhibit.  The petition, which was signed and filed by an attorney, stated that the decedent was survived by a daughter, who was named as the executrix in the decedent's will, but whose whereabouts were unknown.  The petition also stated that the Defendant was a friend and cousin of the decedent who wished to wind up the decedent's financial affairs and "reduce the estate to cash to be held according to law, if the daughter cannot be found."  The petition requested that the decedent's will be admitted to probate and that the court issue letters testamentary to the Defendant.  A document reflecting certification of publication of the court's issuance of letters testamentary was received as an exhibit.

Defense counsel advised the trial court that the Defendant obtained a $60,000 bond in connection with his services as administrator of the estate.  The prosecutor advised the court, "The bond issue is still being litigated" because the bonding company had denied liability.

The trial court again expressed its desire to receive evidence regarding the manner in which the decedent's funds had been spent.

Investigator Ellis testified that he determined from his investigation that $101,394.02 was deposited to the estate's bank account.  He said payments were made from the account to the estate's attorney and for repairs to the decedent's house, which was part of the estate.  He said payments were made from the estate account for the house's utilities.  He said that tenants had lived in the house for a time, that the Defendant collected $16,000 in rent payments from the tenants, and that the house had not been sold.  Investigator Ellis said that the Defendant spent $34,836.42 on estate matters and that the remaining $66,957.60 could not be attributed to estate expenses.  Investigator Ellis said his computations regarding the loss to the estate did not include an amount for the sale of the decedent's personal property.  He said checks had been written from the estate's account to the Defendant and the Defendant's son.  Investigator Ellis said checks

-4-

had been written for home repairs at the Defendant's house and at the decedent's house, and for a car repair for "D. Greene." Investigator Ellis said he had calculated the total loss to the estate at $83,457.60, which consisted of the $66,957.60 that had been spent from the bank account for non-estate expenses and the $16,000 the Defendant collected in rent from the tenants of the decedent's house.

Investigator Ellis acknowledged that he had no proof showing that the $36,873.70 withdrawn in cash from the bank account had not been used for estate expenses. He agreed that the Defendant was the only person with authority to make cash withdrawals.

Defense counsel advised the trial court that counsel met with the Defendant, as ordered by the court, and reviewed the estate's expenditures. Counsel stated that the Defendant had dementia and had a limited memory but that the Defendant had signed an affidavit that "is the best that he could do." Counsel said the Defendant had no memory of how the cash withdrawals had been spent. The affidavit was received as an exhibit. In it, the Defendant stated that he was impaired in his ability to remember his expenditures from the decedent's estate because he suffered from dementia. He stated, however, that he recalled several specific expenditures made for himself, his family members, legal fees associated with the decedent's estate, work on the decedent's home, and storage of the decedent's personal property. The Defendant stated that, when the decedent was on his deathbed, he told the Defendant that the Defendant could have all his property. The Defendant acknowledged that he had been advised by his attorney that the decedent's deathbed bequest was not a defense to the criminal charge in view of the decedent's will leaving the decedent's property to the decedent's daughter.

An Affidavit of Income and Property, completed by the Defendant, was received as an exhibit. It reflected that the Defendant received $720 per month in Social Security benefits, had $200 in a bank account, and owned $200 worth of furniture. He had the following monthly expenses: rent, $350; utilities, $250; health insurance, $60; transportation, $150; cell phone, $50, cable television, $100; for a total of $960 of monthly expenses.

Defense counsel stated that the Defendant could pay $100 per month in restitution. In addition, the record reflects that the trial court had determined that the Defendant was indigent and that the Defendant was represented by appointed counsel.

Terri Greene, the decedent's daughter, testified that she was the decedent's only heir. She said that the decedent's house was in poor repair and that all of the decedent's personal property from the house was gone. She said that her parents knew she had been living out of state and that, at some point, her mother changed the telephone number. Ms. Greene said she had not known the new number. She said that she lived in Colorado for twelve or fifteen years, until her job was transferred to South Carolina, where she had

lived for nine years, and that she did not think she was "hard to find." Ms. Greene said the estate's assets could have changed her life. She said she could have purchased a house. She said she had stress and anger over being left with nothing.

Ms. Greene testified that the Defendant and the Defendant's son had lived in the decedent's house after the decedent's death. She said the Defendant sold the decedent's household property in a yard sale. She said a safe had been in the house and was no longer there. She said a car she owned and her parents' car and truck were gone.

Ms. Greene testified that she had lost her job due to the Defendant's actions. She said it had been necessary for her to "come back and forth" and that she had incurred expenses and attorney's fees. She agreed that she was involved in a civil lawsuit regarding the bond the Defendant had obtained as administrator of the estate and that she had not received any money from the bonding company.

Ms. Greene testified that when she lived out of state, she had been in contact with her family "[o]ccasionally." She said she had not known anything about her father's having been in a nursing home. She said she had not been present for her mother's death or her father's burial. She said she and the Defendant were not relatives. She said the Defendant had claimed to be the decedent's brother, friend, and cousin at various times. She said the Defendant had claimed she was dead.

Ms. Greene testified that she learned of her father's death when she and a friend "called the court system." She said she was advised that the matter had been turned over to an attorney. She said she spoke to the attorney, who said the decedent had been in the process of making a new will but had died before completing it.

The trial court found, in considering the statutory mitigating factors proffered by the defense, that the Defendant's conduct neither caused nor threatened serious bodily injury. *See* T.C.A. § 40-35-113(1) (2019). The court rejected that substantial grounds existed which tended to excuse or justify the Defendant's criminal conduct, though failing to establish a defense. *See id.* at (3).

In considering the statutory aggravating factors, the trial court found that the amount of property taken from the victim was particularly great. *See id.* § 40-35-114(6) (Supp. 2014 & 2015) (subsequently amended). The court noted that the Defendant stole the victim's entire inheritance other than the house and that the victim had testified the inheritance could have changed her life. The court found that the Defendant abused a position of public or private trust because he had been appointed administrator of the estate and disposed of the estate property inappropriately. *See id.* at (14). The court weighed the enhancement factors heavily.

The trial court found that others needed to be deterred from stealing from an estate and that individuals who handled estates "need to know that they are held to a higher standard, that they're holding this property for the beneficiaries and also to handle the claims against the estate and it's got to be done totally by the book and totally legally." The court noted that, notwithstanding the Defendant's claim that he suffered from dementia, the medical records did not reflect this diagnosis and that the Defendant had been alert and oriented when examined by a doctor. The court said the nature and circumstances of the offense were "outrageous." The court stated:

> But the whole thing with this, looks like, he's given property to his family, he doesn't have anything now except $200 in furniture and looks like he's transferred everything to someone else, like his kids, and then he's like, well, I can't pay it back except $100 a month. I don't have anything. And he won't account for where all of it went.

The trial court imposed a nine-year, split confinement sentence with one year to be served in jail and eight years to be served on community corrections. In imposing a year of jail service, the court found that confinement was particularly suited to provide an effective deterrent to others because "[o]ther people need to be deterred in handling estates and especially to take out all the cash and the property in the estate and then not be able to account for it when the Court's given you plenty of opportunity to do that." The court ordered that the balance of the sentence would be served "on house arrest, community corrections."

The trial court set the amount of restitution at $83,457.60. The court said this amount consisted of $66,957.60 from the estate account plus $16,000 rent.[3] The court found that the Defendant "has been a little bit deceptive in this in that he's, oh, I've got dementia, I don't know where it went. I don't own any property, don't have anything anymore, everything is gone." The court found that the Defendant had "been giving all of this stuff to his kids." The court said that if the victim were able to collect on the bond in the civil action, the amount should be deducted from the restitution because "she can't double-dip." When asked by the prosecutor if the Defendant had a minimum monthly payment requirement for the restitution, the court stated, "After he – when he's released." The court did not specify a monthly payment amount. The court characterized the total restitution amount as "contingent" upon the outcome of the victim's civil litigation with the bonding company. The trial court again reiterated its belief that the Defendant had been "deceptive" regarding his lack of assets and lack of recollection of how he had spent the money from the decedent's estate. The court stated, "And if that civil case works out and you get paid for that bond, you've got to call the DA. Hopefully that will happen."

---

[3] We note that the sum of $66,957.60 and $16,000 is $82,957.60. We likewise note that Mr. Ellis's testimony contained the mathematical error.

The court entered a note on the judgment that the restitution award would be reduced if the victim recovered from the bonding company.

This appeal followed.

The Defendant contends that the trial court abused its discretion in awarding restitution which was contingent and not determined based upon the Defendant's ability to pay and in sentencing him to split confinement, rather than full probation. We review a trial court's sentencing determinations for abuse of discretion, with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 683, 707 (Tenn. 2012); *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012).

# I

## Restitution

The Defendant contends that the trial court abused its discretion in determining the amount of restitution without considering the Defendant's financial resources and future ability to pay, in setting a restitution amount that was contingent upon the outcome of a civil lawsuit, and in failing to establish a payment schedule. The State responds that the court did not abuse its discretion because it considered the Defendant's financial resources and future ability to pay and did not establish a contingent restitution amount. The State concedes, though, that the court erred in failing to set a payment schedule.

A defendant convicted of a felony or misdemeanor may be ordered to pay restitution to the victim or victims in conjunction with a sentence of probation or continuous confinement in a local jail, workhouse, or department of correction. T.C.A. § 40-35-104(a), (c)(2), (6), (8) (2014) (subsequently amended); *see id.* § 40-35-304(a) (2019). Restitution is mandatory in theft cases. *Id.* § 40-20-116(a) (2018). The amount is determined based on "the nature and amount of the victim's pecuniary loss." *Id.* § 40-35-304(b). "Pecuniary loss," in the context of this section, means "[a]ll special damages . . . as substantiated by evidence in the record or as agreed to by the defendant" and "[r]easonable out-of-pocket expenses incurred by the victim resulting from the filing of charges or cooperating in the investigation and prosecution of the offense[.]" *Id.* § 40-35-304(e)(1)-(2). However, the restitution award "does not have to equal or mirror the victim's precise pecuniary loss." *State v. Smith*, 898 S.W.2d 742, 474 (Tenn. Crim. App. 1994); *see State v. Mathes*, 114 S.W.3d 915, 919 (Tenn. 2003). At the time of the sentencing hearing, the court shall specify "the amount and time of payment . . . to the victim and may permit payment . . . in installments." T.C.A. § 40-35-304(c). The court may not establish a payment "schedule extending beyond the statutory maximum term of probation supervision that would have been imposed for the offense." *Id.* "The court

shall consider the financial resources and future ability of the defendant to pay" in determining restitution. *Id.* § 40-35-304(d). Moreover, "upon expiration of the time of payment or the payment schedule imposed . . . , if any portion of restitution remains unpaid, then the victim or the victim's beneficiary may convert the unpaid balance into a civil judgment[.]" *Id.* § 40-35-304(h)(1).

The record reflects that the trial court focused on the victim's pecuniary loss but not the Defendant's financial resources and future ability to pay. Although the State and the defense disagreed on the total amount of the victim's loss as a result of the offense, the Defendant conceded, by his guilty plea, that he had stolen more than $50,000 from the decedent's estate. His attorney argued at the sentencing hearing that the loss to the victim was around $66,000, rather than the $83,457.60 proposed by the State. At the guilty plea and sentencing hearings, the court was dissatisfied with the Defendant's concession that the funds had been converted to unspecified personal use and repeatedly mentioned its desire to know the details regarding how the Defendant had spent the estate's assets. The court declined to impose a sentence at the guilty plea hearing due to its desire to hear more evidence about the Defendant's specific expenditures of the money.

After the trial court's insistence at the guilty plea hearing that it receive evidence of the specific expenditures, the Defendant and trial counsel prepared an affidavit in which the Defendant accounted for the specific expenditures, to the extent that he could recall them. The Defendant, who was age seventy-six, stated in the affidavit that his memory was impaired due to dementia. Nevertheless, the court discredited the Defendant's report of dementia and impaired memory on the basis that dementia was not mentioned in the exhibit containing medical records from two of the Defendant's doctors, one of whom was a cardiologist, and the other of whom was not represented to be a neurologist. The court found, as well, that the Defendant had transferred assets to his children in order to avoid responsibility for restitution, despite the lack of evidence in this regard. Although the record showed that the Defendant had paid estate assets to his children or had used it for their benefit, no evidence showed that he transferred any personal assets to them to avoid paying restitution. The Strong-R report stated that the Defendant had relied on family members to manage his finances within the previous six months. Despite the court's findings discrediting the Defendant's statement in his affidavit regarding dementia and memory loss and the court's finding that the Defendant had transferred assets to avoid restitution, the Defendant did not testify, and the evidence of record does not otherwise support the court's findings regarding the Defendant's having been deceptive.[4]

---

[4] In addressing a different issue in its brief, the State argues that the trial court's adverse credibility determinations are supported by the record. The State notes that the presentence report did not reflect that the Defendant had reported a dementia diagnosis. We note, however, that the Defendant provided this

Aside from its rejection of the Defendant's claim that he could only pay $100 per month, the trial court failed to make any findings regarding the Defendant's financial resources and ability to pay. The Defendant presented an affidavit reflecting monthly expenses of $960, monthly income of $720, and assets of $400. The Defendant advised the presentence report investigator that he relied upon his children "quite a bit" for financial assistance. The proof showed that the Defendant was elderly and retired. Likewise, the record reflects that after the return of the indictment, the trial court found that the Defendant was indigent.

The trial court set the restitution at the full $83,457.60 sought by the State, but it also characterized the award as "contingent" upon the outcome of the victim's civil litigation with the bonding company, stating that the victim could not "double-dip." The court's comments in this regard further illustrate its focus on the victim's pecuniary loss but not on the Defendant's financial resources and future ability to pay.

The trial court's establishing restitution in a contingent amount is also problematic because this court has rejected restitution awards that were contingent upon the outcome of a civil case. *See State v. Johnson*, 968 S.W.2d 883, 887 (Tenn. Crim. App. 1997); *State v. Irick*, 861 S.W.2d 375, 376-77 (Tenn. Crim. App. 1993). In *State v. Lewis*, 917 S.W.2d 251, 257 (Tenn. Crim. App. 1995), this court said, "Disposing of civil liability is not the function of the criminal process. The civil process is far better suited for that. Restitution in the criminal justice system is warranted only when it serves rehabilitation and deterrent purposes." To that end, "[t]he terms of restitution should be definitive, consistent, and separate from other judgments." *Johnson*, 968 S.W.2d at 887. That said, the restitution statute provides:

---

information to the court at sentencing, both by affidavit and by statement of his counsel. Even if we assume that he failed to mention it to the presentence investigation officer, the failure to mention it is not equivalent to a denial of the condition or proof that the diagnosis did not exist. Second, the State notes that the Defendant provided two affidavits to the court at sentencing which contain what the State characterizes as conflicting information about the Defendant's ownership of a car. In one affidavit, the Defendant stated that he used estate funds for repairs to "my and my daughter-in-law's car." The affidavit does not state the date of the payment, but the indictment specified that the offense occurred between October 7, 2014, and January 4, 2016. In the other affidavit, which was dated May 10, 2019, he stated that he did not own a car. The fact that the Defendant claimed he did not own a car at the time of sentencing is not inconsistent with his having owned one more than three years earlier. Third, the State notes that the Defendant stated in an affidavit that he paid for a carport for himself from estate funds, but in the more recent affidavit, it was not listed as an asset. As with the car, whether he owned a carport more than three years before the sentencing hearing is not determinative of whether he owned one at the time of sentencing. We note, as well, that the Defendant lived in rental property owned by his son at the time of the sentencing hearing.

-10-

A defendant, victim or district attorney general at any time may petition the sentencing court to adjust or otherwise waive payment or performance of any ordered restitution or any unpaid or unperformed portion of the restitution. The court shall schedule a hearing and give the victim and the defendant notice of the hearing, including the date, place and time and inform the victim and defendant that each will have an opportunity to be heard. If the court finds that the circumstances upon which it based the imposition or amount and method of payment or other restitution ordered no longer exist or that it otherwise would be unjust to require payment or other restitution as imposed, the court may adjust or waive payment of the unpaid portion of the restitution or other restitution or modify the time or method of making restitution. The court may extend the restitution schedule, but not beyond the term of probation supervision.

T.C.A. § 40-35-304(f). As applied to the present case, once the court establishes a restitution award upon remand, the statute provides the mechanism by which the Defendant, the State, or the victim may request that the court adjust or waive its award, should the victim prevail in the civil lawsuit.

Upon review, we conclude that the court abused its discretion in its restitution award. *See State v. Comer*, 278 S.W.3d 758 (Tenn. 2008) (holding that, in determining restitution, the sentencing court must consider a defendant's financial resources and ability to pay); *see also State v. Lane*, 254 S.W.3d 349, 353 (Tenn. 2008) (holding that the failure to consider a defendant's financial ability to pay restitution was a "plain and palpable abuse of discretion[.]"); *State v. Tyson B. Dodson*, No. M2018-01087-CCA-R3-CD, 2019 WL 3946097, at *3 (Tenn. Crim. App. Apr. 16, 2019) (holding that the trial court erred in failing to consider the defendant's financial resources and future ability to pay and in failing to determine the amount of restitution and the payment schedule). We also conclude, as the State has conceded, that the court failed to set a payment schedule. *See* T.C.A. § 40-35-304(c).

Because the trial court both premised its decision upon factual findings which were unsupported by the record and departed from the statutory procedure for establishing a definitive restitution amount and payment schedule, we reverse its judgment and remand the case for determination of a proper restitution award, with consideration of the Defendant's financial resources and future ability to pay, and for the establishment of a monthly payment schedule. *See Tyson B. Dodson*, 2019 WL 3946097, at *3 (remanding for consideration of restitution award and establishment of a payment schedule).

-11-

## II

## Manner of Service of Sentence

The Defendant contends that the trial court erred in imposing split confinement. He argues that he should have been placed on probation with community corrections supervision. The State counters that the court did not abuse its discretion in imposing split confinement.

Generally, probation is available to a defendant sentenced to ten years or less. T.C.A. § 40-35-303(a) (2014 and Supp. 2015) (subsequently amended). The burden of establishing suitability for probation rests with a defendant, who must demonstrate that probation will "'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)); *see* T.C.A. § 40-35-303(b); *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008).

A sentence is based upon "the nature of the offense and the totality of the circumstances," including a defendant's background. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *see State v. Trotter*, 201 S.W.3d 651, 653 (Tenn. 2006). A trial court is permitted to sentence a defendant who otherwise qualifies for probation or alternative sentencing to incarceration when:

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C) (2019); *see Trotter*, 201 S.W.3d at 654. "The guidelines applicable in determining whether to impose probation are the same factors applicable in determining whether to impose judicial diversion." *State v. Trent*, 533 S.W.3d 282, 291 (Tenn. 2017). The relevant factors for a trial court to consider include a defendant's amenability to correction, social history, criminal history, and physical and mental health, and the need for special and general deterrence. *Id.*; *see State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *see also* T.C.A. § 40-35-103.

The record reflects that the Defendant was eligible for probation because the sentence imposed was ten years or less. *See id*. § 40-35-303(a). However, he was not considered a favorable candidate for probation based upon his conviction of a Class B felony. *See id*. § 40-35-103(1)(A)-(C); 40-35-102(6)(A)-(D) (2019). The record reflects that the trial court based its decision to impose some confinement based upon the nature and circumstances of the offense, the need to avoid depreciating the seriousness of the offense, and the need to provide deterrence to others. *See id.* § 40-35-103(1)(B).

In *State v. Hooper*, 29 S.W.3d 1, 13 (Tenn. 2000), our supreme court concluded that deterrence can be the sole basis for the denial of alternative sentencing "when the record contains evidence which would enable a reasonable person to conclude that (1) deterrence is needed in the community, jurisdiction, or state; and (2) the defendant's incarceration may rationally serve as a deterrent to others similarly situated and likely to commit similar crimes." Likewise, in *State v. Trotter*, 201 S.W.3d 651, 654 (Tenn. 2006), the supreme court said that when

> the seriousness of the offense forms the [sole] basis for the denial of alternative sentencing, . . . the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree, and the nature of the offense must outweigh all factors favoring a sentence other than confinement."

(Internal quotation marks and citation omitted.) However, the supreme court has also said that when the denial of alternative sentencing is based upon both considerations in Tennessee Code Annotated section 40-35-103(1)(B), the "heightened standard of review," which otherwise applies when a trial court imposes confinement based upon a single factor listed in the section, does not apply. *See State v. Sihapanya*, 516 S.W.3d 473, 476 (Tenn. 2014).

As we have stated, the trial court focused at the guilty plea hearing and at the sentencing hearing on receiving a detailed accounting of the Defendant's expenditures of the estate's assets. As we have also stated, the court made several findings that are unsupported by the record: that the Defendant had been deceptive about his lack of memory, that he had been untruthful about his dementia diagnosis, and that he had given his assets to his children in order to avoid paying restitution. The court relied heavily on these findings when it determined that confinement was warranted based upon the nature and circumstances of the offense and based upon the need to avoid depreciating the seriousness of the offense. Thus, to the extent that the court relied upon these considerations based upon factual findings that were unsupported by the record, the court erred. The remaining factor, the need to provide deterrence to others, is an appropriate basis for denying alternative sentencing, provided the record contains evidence of the

-13-

need for deterrence in the community, jurisdiction, or state, and evidence that incarcerating the defendant would be rational deterrent to others similarly situation and likely to commit similar offenses. *See Hooper*, 29 S.W.3d at 13. The court did not, however, make these findings.[5]

We conclude that the trial court abused its discretion in imposing a sentence involving confinement based upon factors which were unsupported by the evidence and that its reliance on the need for deterrence, without findings regarding the *Hooper* findings, is not an appropriate basis upon which this court might otherwise rely to affirm the Defendant's sentence. When this court reverses a trial court's sentencing determination, our options include (1) modifying the sentence based upon the record and (2) remanding to the trial court for resentencing. *See* T.C.A. § 40-35-401(c)(2), (3) (2019). Because we have already determined that this case must be remanded for reconsideration of the restitution award, we, likewise, remand to the trial court for resentencing based upon the guidelines of the Sentencing Reform Act, as applied to the facts of the present case.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is reversed. The case is remanded for a determination of the proper restitution amount and for resentencing.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

---

[5] As we have stated, the findings are not required when a trial court bases a sentence of confinement on both factors listed in Code section 40-35-103(1)(B), the additional findings relative to the need to provide deterrence to others are not required. *See Sihapanya*, 516 S.W.3d at 476. Because the trial court in the present case relied upon multiple factors, the findings were not necessary at that time. Because we have determined, however, that the court erred in applying the other factors based upon facts which are unsupported by the record, the court's determination regarding deterrence is the sole remaining factor supporting its order of confinement. As such, the *Hooper* findings are required if a sentence of confinement is imposed.